**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **TERRY WHITE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **No. 3:12-0783** |
| | ) | **JURY DEMAND** |
| **HOEGANAES CORPORATION** | ) | |
| | ) | **Judge Campbell** |
| | ) | **Magistrate Judge Knowles** |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Comes now Plaintiff, by and through counsel, and responds in opposition to Defendant's Motion for Summary Judgment. In support thereof, Plaintiff shows the following:

**I. Factual Summary**

**Introduction: Plaintiff's Employment with Hoeganaes**

Plaintiff was hired by Defendant in the Hoeganaes Corporation on February 20, 1980. (Ex. 1 to Pltf. Resp. to Def. Motion for Summary Judgment, Deposition of Terry White ("White Depo.") p. 8). At the time of his constructive termination, Plaintiff had worked for Defendant for 31 years and was 63 years old, the oldest employee at Hoeganaes. (Ex. 2 to Pltf. Resp., EEOC Charge of Discrimination ("Charge")). Plaintiff planned on working at Hoeganaes until he was 65 or 66. (White Depo. p. 8).

Hoeganaes Corporation produces powdered ferrous metals (referenced herein as "iron powder") for use in diverse metallurgical applications at its plant located in Gallatin, Tennessee

1

(the "Gallatin Plant"). (Defendant's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment) ("Def. SOF" ¶ 3, d.e. 23). This iron powder is combustible and can present a significant flash fire safety hazard if the powder escapes from the process and builds up in sufficient quantities as fugitive dust. (Def. SOF ¶ 2).

Plaintiff's lengthy and distinguished career with Hoeganaes began with a position as a "plant helper" for approximately one year. (White Depo., pp. 8-9). White's career progressed to a position in the refractory, or metal shop, for approximately five years. He was then transferred to a position as a shipper, a position he held for 16 years. (White depo., pp. 9-10). Finally, White advanced to a position in packing department where he worked as a packing operator, where he held a position for approximately ten years. (White depo., p. 10) (Def. SOF ¶ 5). His job as a packer required him to fill boxes with powder. (White Depo. p. 22). The powder was put in molds, heated and pressed to make automobile parts and computer parts. (White Depo p. 23). Lastly, the boxes would be shipped to customers. (Def. SOF ¶ 6). During Plaintiff's employment, he had health issues, including heat exhaustion, fainting and depression, for which he used FMLA leave. There were several tragic accidents at Hoeganaes that precipitated Plaintiff's depression. In addition, Plaintiff participated in protected activity by filing an EEOC claim in 2008. After the tragic accidents, significant changes in housekeeping procedures and policies were implemented at the plant. Plaintiff was accused of violating those procedures. (White Depo. 61-62); Defendant used those charges for constructively discharging Plaintiff on September 23, 2011. (White Depo. p. 8).

**A. Plaintiff's Age and Health Conditions**

Plaintiff suffered a great deal of stress while working at Hoeganaes because he believed he

Case 3:12-cv-00783   Document 28   Filed 08/23/13   Page 2 of 25 PageID #: 402

would be fired due to his age. (White Depo. pp 63-64.). In addition, Plaintiff had several health issues while he was employed by Hoeganaes. Plaintiff underwent by-pass surgery in 2007. Since the surgery, he became weak when he was exposed to high heat. (White Depo. p 64). Plaintiff was exposed to high levels of heat on a daily basis; his work area was over 100 degrees. (White Depo. P. 63). Plaintiff experienced fainting spells in March and August 2011 for which he received medical treatment and took FMLA leave. (White Depo. p. 82, 89). On August 7, 2011, Plaintiff suffered heat exhaustion and received treatment at the hospital. (White Depo. 89).

On August 24, 2011, Plaintiff discussed his health concerns with Defendant's Director of Human Resources, Joyce Birdwell. He told her that since the deaths of the five Hoeganaes employees, he had suffered depression. (White Depo. p. 81). He also inquired as to whether she had heard of the ADA. She answered no. (White Depo. 81). Around the time of this conversation, Plaintiff worried that his health was getting worse and that his "FMLA had to be piling up on me." (White Depo. p. 83).

## B.  Plaintiff's Prior EEOC Protected Activity and Subsequent Retaliation by Supervisor

For the last several years of his employment, until the time of his constructive termination, Plaintiff was under the direct supervision of Defendant's employee, Tina League. (White Depo p. 24). In 2008, Plaintiff was written-up by Tina League for allegedly falsifying records on which Plaintiff wrote down how many boxes he made. Plaintiff believes he had made a mistake rather than falsifying documents. (White Depo pp. 28-29, 30). Plaintiff disagreed with this write-up. (White Depo. p. 31). Also in 2008, Plaintiff filed an EEOC complaint concerning League. (White Depo. p. 28). Plaintiff did not pursue the EEOC claim because Defendant's managers informed him that he could come back to them and discuss the matter. (White Depo. pp 28-29).

3

As direct supervisor, League made the initial decisions to discipline and issue the Plaintiff write-ups. (Ex. 3 to Pltfs. Resp., Deposition of Marcy Wurst ("Wurst Depo."), Exhibits 5 & 6 at p. 213).

**C.  Plaintiff's Work Performance History**

Despite Plaintiff's age and health, he received satisfactory marks on his Production/Maintenance Performance Evaluations dated February 23, 2010 and April 19, 2011 (*id*). Specifically, in 2011, Plaintiff received satisfactory marks in the areas of work effort, quality, teamwork, job knowledge, safety, housekeeping, and training. (*id*). Notably however, Plaintiff received a sub-satisfactory score on his attendance record, which indicated he had been absent for 3-4.5 occurrences. (*id*). Plaintiff had missed work due in March of 2011 due to his disability. (White Depo. p. 89). Plaintiff also sought medical treatment for depression earlier in the year. (White Depo. p. 82). However, Plaintiff received no remarks necessitating a performance improvement plan (Wurst Depo., Exhibits 5 & 6) per company policy.

**D.  Tragic Accidents at the Gallatin Plant and Effect on Plaintiff's Health**

On January 31, 2011, there was a flash fire (the "first accident") at the Gallatin Plant which ultimately resulted in the death of two individuals. (Def. SOF ¶ 7). On March 29, 2011 there was a second flash fire (the "second accident") in which an employee received second degree burns. (Def. SOF ¶ 8). On May 27, 2011, there was an explosion (the "third accident") at the Gallatin Plant which ultimately resulted in the death of three individuals. (Def. SOF ¶ 9). Government investigators determined that combustible fugitive iron dust was the primary cause of the first two accidents and contributed to the third accident. (Def. SOF ¶ 10).

4

These accidents revealed that the iron dust was combustible and could present a significant safety issue under certain conditions. (Def. SOF ¶ 11). Hoeganaes shut down the Gallatin Plant for several weeks after the third accident to conduct a safety audit and to assess and revise operating practices, maintenance practices, and housekeeping procedures. (Def. SOF ¶ 12). One of the major changes in work practices that came from this comprehensive safety review related specifically to the housekeeping and cleaning procedures for the combustible iron dust in the plant. (Def. SOF ¶ 13). After the deaths of the Hoeganaes employees in 2011, Plaintiff suffered from depression and sought medical treatment. (White Depo. p. 82).

## E. Significant Changes to Housekeeping and Cleaning Procedures and Lack of Appropriate Housekeeping Equipment

New cleaning procedures were implemented at the Gallatin plant following these tragedies. (White Depo. p. 51) (Ex. 4 to Pltfs. Resp., Deposition of Robert Kuhle ("Kuhle Depo."), p. 11,). Until 2011, Defendant "always had a clean-up thing but we never cleaned up, you know, it was more of a straighten-up than a clean-up until 2011." (White Depo. p. 32). According to Robert Kuhle, Defendant's Plant Manager, iron dust was pervasive at the time the new strategies were implemented (Kuhle Depo. p. 15). Because Defendant never enforced a "clean-up" policy prior to 2011, dust had been accumulating ever since they built the Hoeganaes Plant (White Depo. p. 63). Prior to the tragic incidents, there could have been up to "10,000 pounds of powder" but the employees only had a shovel to clean. (Ex. 5 to Pltfs. Resp., Deposition of Tina League ("League Depo."), p. 17)

A Case Study published in December 2011 by the U.S. Chemical Safety and Hazard Investigation Board supports Plaintiff's position, stating:

> "Observations by CSB investigators at the Gallatin facility shortly

5

after the first incident indicated that combustible dust was leaking from equipment and that housekeeping was ineffective. Combustible iron dust coated almost every surface up to 4 inches deep and was visible in the air. Mitigation of the combustible dust hazard by Hoeganaes was limited to a less-than-adequate vacuuming service, sparsely enclosed conveyance equipment, and an inadequate baghouse filtration system.

CSB investigators observed leaks of fugitive dust to the atmosphere when the bags used in the baghouse filtration system were pulsed, which allowed dust to escape into the work areas many times each hour…[Y]et the CSB found that the baghouses were often out of service." (d.e. 25-1, U.S. Chemical Safety and Hazard Investigation Board Case Study, ("Study") p. 15)

According to Plaintiff's co-worker, Donna Sherrell, even the hood in Plaintiff's work area over Plaintiff's head had powder on it. "When it would go to shake, powder would fall." (Ex. 6 to Pltfs. Resp., Deposition of Donna Sherrell ("Sherrell Depo.") p. 17).

Because of the dust problem, any powder that was built up in "any ant hills" was required to be cleaned up. (Kuhle Depo. p. 14-15). However, at the time the employees were required to implement new clean-up strategies, they were only provided with an airline [filter] and a whisk broom. (White Depo p. 46). During that first cleaning, Plaintiff was expected to clean-up nine or ten years' worth of dust. (White Depo. P. 63). In addition, there were fans in Plaintiff's work area due to the high level of heat." (White Depo. P. 63). Dust could be seen in the air in the summer of 2011 "anytime there is powder there or a wind or fan." (Sherrell Depo. p.13).

Sometime after the new housekeeping policies were implemented, employees were provided with vacuums. However, the vacuums would not vacuum up piles of dirt. (White Depo. P. 46). Plaintiff discussed the lack of inadequate clean up tools with his supervisor, Tina League. Plaintiff informed League that the vacuum cleaners were not only inadequate, but frequently were borrowed by other employees and not returned. (White Depo. pp 47-48). Additionally, the new clean-up procedures were very time consuming and Plaintiff needed up to two additional

6

hours to clean up adequately. (White Depo. p. 23).

In or around the end of June, a meeting about took place concerning the new clean-up procedures, Plaintiff was presented with a piece of paper stating that employees were at risk of termination if they did not clean up their areas well enough. On June 28, 2011, Plaintiff expressed concerns about this policy with Defendant's employees Tina League, Plaintiff's direct supervisor, Bob Kuhle, Plant Manager, Jim Layman, Health and Safety Manager, and Dave Kasputis, President. (June 29, 2011 Inter-office Memorandum ("Memo"), d.e.. 25-5). At this time, Terry informed League, Kuhle and Layman that "we have nothing to clean up with." (White Depo. P. 48). According to Plaintiff, "a lot of stuff was leaking and maintenance – we turned it in and it never got fixed by maintenance." Those maintenance requests were turned in to League. (White Depo. p. 63.)

Because the vacuums could not reach all the dust, there were trucks that came in and "sucked up the powder up." (White Depo. p. 63). However, Kuhle, Plant Manager, noted that despite all of the new equipment and measures taken to adequately clean the dust, it was possible that employees cleaned the area and then "somehow the powder arrived 20 seconds after because there was some hole at some deck above them or something like that." (Kuhle Depo. p. 29). Under the new clean-up procedure, employees could not leave their work station in order to clock out at the end of their shift until the next shift employee approved the cleanliness of their stations. (Sherrell Depo p. 21). "If that person coming on doesn't – we had to hear that or we couldn't clock out to go home." (Sherrell Depo. p. 21). Part of Plaintiff's job was to judge the cleanliness of the workstation of the employee from the previous shift. "I'm keeping the record of who come in before me. And – and the ones that's coming in after me is taking care of my – their judging me. I'm judging the guy in front of me." (White Depo p. 44-45). "Once you start

the system, the clean-up is done, you know. Everything is moving then." (White Depo. p. 45). Employees were to turn in a checklist at the end of each shift and then the next employee coming in would be the one to see the area." (Wurst Depo. p. 28).

### F. Plaintiff's meritless write-up and suspension on July 1, 2011 for allegedly violating new housekeeping and cleaning procedures

On June 30, 2011, Plaintiff and his work partner, Ms. Sherrell, signed off on the daily audit checklist indicating that their work area(s) had been cleaned and were deemed acceptable under the new housekeeping and cleaning procedures. (Def. SOF ¶ 44). Defendant's employee, John Quebedeau, a packing operator arriving for the shift following Plaintiff's shift, told Plaintiff that Plaintiff and Ms. Sherrell that they were free to leave. (Sherrell Depo. p. 25). According to Quebedeau, Plaintiff "asked me if everything looked clean and I said yes." (Ex. 7 to Pltfs. Resp., Deposition of John Quebedeau ("Quebedeau Depo.") p. 12). Plaintiff's co-worker signed off that it was clean. (Quebedeau Depo p. 12). Plaintiff and Sherrell left the plant at 3:00 that day. However during an inspection, notably an hour and a half later from the end of Plaintiff's shift, (White Depo. p. 56), League purportedly discovered dust that had not been cleaned from the floor in Plaintiff and Ms. Sherrell's area. (Def. SOF ¶ 45). Subsequently, Ms. League spoke to Plaintiff and Ms. Sherrell about their area not being cleaned and showed them pictures she took of the area. (Def. SOF ¶ 46). However, the pictures did not clearly indicate which machine the powder came from. Sherrell stated that she could not recognize the location of the dust in the photographs. (Sherrell Depo. p. 25).  Plaintiff denied that he had failed to clean his area. Despite Defendant's claims that the company's investigation, led by Kuhle, Plant Manager, and Vice President of Human Resources, Marcey Wurst determined that both Plaintiff and Sherrell had indeed failed to follow the new housekeeping guidelines, (Def. SOF ¶ 47), neither Wurst nor Kuhle saw Plaintiff's workstation firsthand. Wurst did not go out and physically look at

8

Plaintiff's workstation but rather relied on League's statements. (Wurst Depo. p. 25). Likewise, Kuhle did not see the piles of powder that Plaintiff was alleged to not have cleaned up. (Kuhle Depo. p. 21). On July 1, 2011, Plaintiff and Ms. Sherrell were both issued a written warning and suspended for three days for failure to abide by the new housekeeping and cleaning procedures with respect to daily audits. (Def. SOF ¶ 48) Plaintiff disagreed with this Disciplinary Action and indicated so in writing at the bottom of the form. (Ex. 6 to Wurst Depo.).

## G. Plaintiff's meritless write-up on August 31, 2011 for allegedly violating housekeeping and cleaning procedures

On August 31, 2011, Plaintiff and his work partner, Bill Hunt ("Mr. Hunt") signed off on the daily audit checklist indicating that their work area(s) had been cleaned and were deemed acceptable under the new housekeeping and cleaning procedures. (Def. SOF ¶ 53). However, during Ms. League's safety walk she discovered dust that had not been cleaned from the floor in their area and took photos. (Def. SOF ¶ 54) Subsequently, Ms. League spoke to Plaintiff and Mr. Hunt about their area not being cleaned. (Def. SOF ¶ 55). Plaintiff again denied that he had failed to clean his area. (Def. SOF ¶ 56). On or about August 31, 2011, Plaintiff was suspended pending an investigation. (Def. SOF ¶57). Plaintiff was not provided with an official verbal warning per company policy. (White Depo. P. 62). According to Wurst, the process of Hoeganaes is a "verbal counseling which is documented, a written warning with potentially a suspension and then a termination based on the offense and the history of the offenses." (Wurst Depo. p. 56). Plaintiff stated that he cleaned to the best of his ability and that he did not receive proper training and that League was trying to get rid of me anyway" (White Depo. p. 63-64). Another co-worker, Earnest Clay, testified that leaks existed on August 31, 2011. He testified that either a supervisor, possible League, told him that "she found a leak up there." (Ex. 8 to

9

Pltfs. Resp., Deposition of Earnest Clay ("Clay Depo.) p. 8). Maintenance was called to fix the leak. (Clay Depo. p. 8). Plaintiff was "gone" after the leak incident. (Clay Depo. p. 10).

**H. Plaintiff's constructive termination.**

On September 14, 2011, Plaintiff was provided with three choices: retirement, termination or short term disability. Ultimately, the decision to terminate Plaintiff's employment was a joint decision made by Mr. Kuhle, Jeffrey Wilson, Senior Vice President of Operations, and the human resources department. (Def. SOF ¶ 66) Although Defendant claims that Kuhle inspected Plaintiff's work area prior to Plaintiff's termination, (Def. SOF ¶ 61) Kuhle disavowed this assertion in his deposition. In fact, Mr. Wilson stated that he did not even participate in the investigation. (Ex. 9 to Pltfs. Resp., Deposition of Jeffrey Wilson ("Wilson Depo." p. 41). Although Defendant claims that no extenuating circumstances prevented Plaintiff from doing his job Plaintiff had previously asserted his concerns about this policy with Defendant's employees Tina League, Bob Kuhle, Jim Layman and Dave Kasputis, President. (Memo.). According to Wurst, if the dust was there because machinery was leaking and that Plaintiff couldn't clean the area, then it would have been handled differently, "[b]ecause he would have reported it as an incident that could have been corrected" and it would not have been a disciplinary action if he had reported that there was an area that couldn't be cleaned because of leaks. (Wurst Depo. p. 54).

Notably, on September 16 2011, Plaintiff inquired about the short-term disability option and was told by Defendant's Director of Human Resources, Birdwell, that the disability option no longer existed and that Plaintiff had to choose between retirement or termination. (Charge). At the time of his dismissal on September 23, 2011 Plaintiff was the oldest tenured employee.

(Charge). Plaintiff filed his official Charge of Discrimination on November 11, 2011, which included allegations of age and disability discrimination.

## II. STANDARD OF REVIEW

Defendant as moving party has the initial burden of showing the Court, by reference to the record, the basis for the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the non-moving party has the burden of proof at trial, the movant must carry the initial burden in one of two ways: either by negating an essential element of the non-movant's case or by showing that there is no evidence to support a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.*, 929 F. 2d 604, 606-08 (11th Cir. 1991). Before the Court can evaluate the Plaintiffs' opposition to the motion, it must first determine whether the Defendant has met its initial burden of showing that there are no issues of material fact and that Defendant is entitled to judgment as a matter of law. *Jones v. City of Columbus*, 120 F. 3d 248, 254 (11th Cir. 1997) (per curiam). Bold, conclusory statements that the Plaintiffs cannot meet their burden at trial are insufficient. Only after the movants have met their initial burden does the burden shift to the non-moving party to "demonstrate that there is indeed a material issue of fact that precludes summary judgment." 929 F. 2d at 608.

As the Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), summary judgment is inappropriate unless the evidence is so one-sided that a reasonable jury could arrive at only one conclusion. 477 U.S. at 251-252. "**Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge.**" *Id.* at 255. (Emphasis added). In ruling on a motion for summary judgment, the Court should never weigh the evidence or find the facts. Instead the Court's role under F.R.C.P. 56 is narrowly limited to assessing the threshold issue of whether a

genuine issue exists as to material facts requiring a trial. *Id.* at 249. Thus, the evidence of the non-moving party will be believed as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *See Hunt v. Cromartie*, 526 U.S. 541, 550-555 (1999); *Eastman Kodak Co. v. Image Technical Servs.*, *Inc*., 504 U.S. 451, 456 (1992); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); and *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-159 (1970).

Reasonable inferences are inferences reasonably drawn from all facts then before the Court, after sifting through universe of all possible inferences the facts could support. Reasonable inferences are not necessarily more probably or likely than other inferences that might tilt in the moving party's favor. Instead, so long as more than one reasonable inference can be drawn, and that inference creates a genuine issue of material fact, the trier of fact is entitled to decide which inference to believe and summary judgment is not appropriate. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999); *Patterson & Wilder Const. Co., Inc. v. United States*, 226 F.3d 1269, 1273 (11th Cir. 2000).

Based on the above referenced standard, it is clear that questions concerning the credibility of witnesses are not normally disposable upon motion for summary judgment. Further, it is well established that questions concerning a person's state of mind (such as motive, knowledge, intent, good faith or bad faith, malice, fraud, conspiracy or consent) are rarely disposable at the summary judgment stage. *See Hutchinson v. Proxmire*, 443 U.S. 111 (1979); *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2nd Cir. 2000) (commenting that summary judgment is used "sparingly" where intent and state of mind are implicated); *EMI Catalogue Partnership v. Hill, Holliday, Conners, Cosmopulos, Inc.*, 228 F.3d 56, 61 (2nd Cir. 2000)

12

("caution" must be observed with issues involving a defendant's intent); *Seamons v. Snow*, 206 F.3d 1021, 1027-1028 (10th Cir. 2000) (noting that grant of summary judgment is "especially questionable" in cases delving into a party's state of mind); *United States, ex rel. Cantekin v. University of Pittsburgh*, 192 F.3d 402, 411 (3rd Cir. 1999) (noting the "basic rule" that state of mind issues typically should not be decided on summary judgment); Mendocino *Envt'l Ctr. v. Mendocino County*, 192 F.3d 1283, 1302 (9th Cir. 1999) (observing that state of mind questions are factual issues inappropriate for summary judgment); *Geier v. Medtronic, Inc.*, 99 F.3d 238, 240 (7th Cir. 1996) (applying summary judgment standard with special scrutiny where cases turn on issues of intent and credibility); *Hossaini v. Western Missouri Med. Ctr.*, 97 F.3d 1085, 1088 (8th Cir. 1996) (recognizing the difficulty of disposing intent issues at the summary judgment stage).

# III. ARGUMENT

**A. Plaintiff's claims asserted under the Civil Rights Act of 1991 should not be dismissed as a matter of law.**

Plaintiff concedes that this case is not a discrimination case based on the traditional categories of race, color, religion, sex or national origin. However, Defendant fails to recognize the remedy created by the Civil Rights of 1991 that amended Title VII which creates federal civil rights remedy for damages in cases of intentional discrimination in employment based on disability. Specifically, the Revised Statutes were amended by inserting after section 1977 (42 U.S.C. 1981) the following new section:

`SEC. 1977A. DAMAGES IN CASES OF INTENTIONAL DISCRIMINATION IN EMPLOYMENT.SEC. 1977A. DAMAGES IN

13

CASES OF INTENTIONAL DISCRIMINATION IN EMPLOYMENT.
*[42 U.S.C. 1981a]* reads:

> "(2) DISABILITY. - In an action brought by a complaining party under the powers, remedies, and procedures set forth in…of the Americans with Disabilities Act of 1990 (42 U.S.C. 12117(a))…against a respondent who engaged in unlawful intentional discrimination … under section 101… and the regulations implementing section 102 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12112), or committed a violation of section 102(b)(5) of the Act, against an individual, the complaining party may recover compensatory and punitive damages as allowed in subsection (b), in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

Plaintiff's Complaint and the record clearly support a cause of action pursuant to this statute as to discrimination **based on Plaintiff's disability**. Throughout his employment, Plaintiff participated in protected EEOC activity. For instance, in 2008, Plaintiff filed an EEOC complaint against his supervisor, League. (White Depo. p. 68) After 2008, Plaintiff was subjected to numerous disciplinary action. (White Depo. pp. 61-62) Furthermore, Plaintiff reported his concern that he was being discriminated against due to his age and disability to Defendant's Director of Human Resources, Birdwell, in 2011. (White Depo. pp. 85-86) Even after complaining about discrimination, Plaintiff was subjected to write-ups and subsequent termination (Def. SOF ¶ 57). Defendant's intentional actions of subjecting Plaintiff to merit-less write-ups and subsequent termination are in violation of the Civil Rights Act of 1991 and thus Plaintiff as the complaining party may recover compensatory and punitive damages as allowed in subsection (b), in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the Defendant.

**B. Plaintiff's FMLA, age discrimination, disability discrimination and ADA claims do not**

14

**fail because he did not disavow such claims during his deposition.**

Plaintiff did not disavow his claims of age discrimination, disability discrimination or any violation of the FMLA in his deposition. Plaintiff clearly expresses his concern that he would be terminated for his age and disability. (White Depo. p. 81) Alternatively, even if Plaintiff had inconsistencies in his testimony, those inconsistencies are enough such that an issue of material fact has been created and thus the case should not be dismissed on summary judgment. During his Deposition, Plaintiff testified as follows:

> Q: What about your age made you think – what, if anything, did she do that made you think she wanted to get rid of you because of your age?
>
> A: Well, I had got hot at work there one time and she would – her and Mark – a few months earlier, her and – and – human resources?
>
> Q: Joyce?
>
> A: Joyce. Yes, Joyce. They give me – they told me to take two weeks off of disability. Because they felt like I was, you know – the weather was too hard on me for working upstairs. And I come back. I had to go through the doctors to get back to work.
>
> Q: Okay. Anything other than suggesting you take two weeks off that made you think she wanted to get rid of you because of your age?
>
> A: Oh, yeah. Just, you know, every time – every time Tow Joe or Peggy come out, something always come of it.
>
> Q: What does that have to do with your age?
>
> A: *I was 63. I had bypass surgery in 2007. And I just got weak whenever it got real hot.* (Pl. Depo. pp. 64: 4-25).
>
> Q: My question is, how do you connect your using FMLA leave to the fact that you were terminated?
>
> A: Well*, I feel like that it was my age and my health was getting worse. And I felt like FMLA had been piling up on me. And I think that they used that to perceive what my health was going to be in another year or two*. (White depo. p. 83: 19-25).
>
> Q: Okay. Why did you think Tina was, as you said, doing this to you on purpose?

15

A: Well, I just think she thought it would be a good time to get rid of me because she had two people in there. *You know, because of my age*. *And the fact that I had been quite a bit sick that year.* I had fainted in March two times, And I – so I had went to the – to the emergency room, heat stroke on – later on that year. (White Depo. p. 60).

Q: Did you ever tell Joyce that you thought Ms. League was discriminating against you because of your age?

A: *Yea, I believe I did*.

Q: When did you do that?

A: That was in 2011. (White Depo. pp. 85-86).

The aforementioned excerpts clearly indicate that Plaintiff was very concerned about being terminated due to his age, disability and use of the FMLA. Although Plaintiff's later testimony may seem inconsistent, any discrepancy in Plaintiff's statements are material facts that should be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *See Hunt v. Cromartie*, 526 U.S. 541, 550-555 (1999); *Eastman Kodak Co. v. Image Technical Servs.*, *Inc.*, 504 U.S. 451, 456 (1992); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); and *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-159 (1970). Furthermore, so long as more than one reasonable inference can be drawn, and that inference creates a genuine issue of material fact, the trier of fact is entitled to decide which inference to believe and summary judgment is not appropriate. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999); *Patterson & Wilder Const. Co., Inc. v. United States*, 226 F.3d 1269, 1273 (11th Cir. 2000). Thus, Plaintiff's age discrimination, disability discrimination and FMLA claims should not be dismissed.

**C. Plaintiff's FMLA claim does not fail under *Twombly* because Plaintiff has pled sufficient facts to satisfy the *Twombly* requirement.**

In his Complaint, Plaintiff alleges that "Plaintiff's discipline and termination were motivated

by his age, perceived disability, and use of FMLA." (Compl. ¶ 23) Defendant argues that Plaintiff's FMLA claim would fail under *Bell Atlantic Corp. v. Twombly* and its progeny. *Twombly,* however, addresses the standard of review for a motion under Fed. Rule Civ. P. 8(a)(2) and Fed Rule Civ. P. 12(b)(6), not a motion under Fed. Rule Civ. P. 56(c). The standards for motions to dismiss and motions for summary judgment are not the same.

When considering a motion to dismiss for failure to state a claim upon which relief can be granted, the court is ***limited to an examination of the complaint alone***. *Wolcotts Fin. Serv., Inc. v. McReynolds*, 807 S.W.2d 708, 710 (Tenn. Ct. App. 1990). The basis for the motion is that the allegations in the complaint, when considered alone and taken as true, are insufficient to state a claim as a matter of law. *Cornpropst v. Sloan*, 528 S.W.2d 188 (Tenn. 1975). In contrast, the facts before a court under summary judgment include information ***outside of the complaint*** presented by both parties, rather than facts only in the complaint. Fed. Rule Civ. P. 56; Fed. Rule Civ. P. 12(b)(6). In the case at bar, Plaintiff presented ample evidence outside of the Complaint sufficient to satisfy the summary judgment standard. For example, Plaintiff stated repeatedly in his deposition that he was worried he would be terminated due to his use of FMLA. (White Depo. p. 63-64, p. 81, 83) Because evidence outside of the Complaint must be considered when considering a summary judgment, Plaintiff's FMLA claim should not be dismissed under the summary judgment standard of review.

However, even if the court applies the *Twombly* analysis to Plaintiff's proof, Plaintiff has sufficiently plead enough facts to survive a Rule 12(b)(6) Motion to Dismiss, which requires Plaintiff plead "***only enough facts*** to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all allegations in the

17

complaint are true (even if doubtful in fact)", and the Court should deny a motion to dismiss even if it appears "that a recovery is very remote and unlikely". *Id.* at 1965. In *Twombly,* the Court expressly reconfirmed "we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." 127 S.Ct. at 1974. The Supreme Court unanimously, expressly, and repeatedly has rejected a "heightened pleading standard." *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 113 S.Ct. 1160 (1993). Indeed, in a recent case reversing dismissal, the Supreme Court reaffirmed, "[s]pecific facts are not necessary; the [Complaint] need only 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 127 S.Ct. 2197, 2200 2007 (per curiam), quoting *Bell Atlantic*, 127 S.Ct. at 1964. Thus even if the *Twombly* standard of review applied in the case at bar, Plaintiff has met his burden by alleging in his complaint that he was disciplined and terminated due to his age, perceived disability, and use of FMLA. (Complaint line 19, 23). Furthermore, Tenn. R. Civ. P. 12.02(6) states that motions are not designed to correct inartfully drafted pleadings. *Dobbs v. Guenther*, 846 S.W.2d 270, 273 (Tenn. Ct. App. 1992). However, a complaint should not be dismissed, no matter how inartfully drafted, if it states a cause of action. *Id.* (citing *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 152 (Tenn. 1966); *Collier v. Slayden Bros. Ltd. Partnership*, 712 S.W.2d 106, 108 (Tenn. Ct. App. 1985)).

Therefore, taken into account that Plaintiff has sufficiently satisfied *Twombly* as well as the standard of review for a summary judgment motion, Plaintiff's claims should not be dismissed.

**D. Plaintiff's FMLA, age discrimination claims and disability discrimination claims do not fail as a matter of law because Plaintiff may use indirect evidence to show discrimination.**

18

A plaintiff may prove age, disability and FMLA discrimination through direct or indirect evidence. Distinguishing between cases that involve direct and indirect evidence is "vital" because the framework for the two kinds of cases is different. *Monette v. Elec. Data Sys Corp.*, 90 F.3d 1173, 1184 (6th Cir. 1996). A Plaintiff only needs to prove one or the other, not both. *Burress v. City of Franklin* 2011 U.S. Dist. LEXIS 92668 at 811. In the case at bar, Plaintiff's facts do not support a claim based on direct evidence; however, Plaintiff's claims of discrimination are supported by indirect evidence based on his use of FMLA leave, age, and disability.

Under the indirect evidence method for an ADA claim, the employee must first establish a *prima facie* case of discrimination.  The employee may establish a *prima facie* case of discrimination by showing the he: (1) suffers from a disability as defined by the ADA; (2) is otherwise qualified to perform the requirements of his position, with or without reasonable accommodation; and (3) was discriminated against solely because of his disability. *Macy v. Hopkins County School Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007).

Under the indirect evidence method for an ADEA (age) claim, the employee may establish a *prima facie* case of age discrimination by showing that he: (1) he was within the protected class (forty or over); (2) he was performing his job to the employer's legitimate expectations; (3) he was discharged (or some other action that rises to the level of an adverse employment action); and (4) the employer replaced him with someone substantially younger; or treated someone more favorably who is substantially younger; or other such evidence that indicates that it is more likely than not that his age was the reason for the adverse employment action. See, *Robin v. Espo Engineering Corp.,* 200 F.3d 1081 (7th Cir. 2000).

Under the indirect evidence method for an FMLA claim, the employee may establish a

19

*prima facie* case of FMLA discrimination by showing that he is protected under the FMLA; (2) he suffered an adverse employment decision; and (3) other employees who did not request FMLA leave were treated more favorably than he, or that the adverse employment decision was made because of his request for leave under the FMLA. *Bocalbos v. National Western Life Insurance Company*, 162 F.3d at 383.

1. ***Plaintiff's indirect evidence of disability, age and FMLA discrimination is sufficient to deny Defendant's motion for summary judgment.***

The record is replete with facts to support all claims of age, disability and FMLA discrimination.

**a. Indirect evidence of disability discrimination**.

Under the first prong of the indirect evidence analysis Plaintiff must show that he is a member of the protected class by being disabled as defined by the ADA. *Monette,* 90 F.3d at 1186. Defendant was disabled as the facts indicate that he did suffer from physical impairments of heat exhaustion, sensitivity to high heat, stress, high blood pressure and fatigue, and depression. (EEOC intake questionnaire) (White Depo. p. 81) There impairments substantially limited his ability to perform his job compared to other employees having comparable training, skills and abilities. Defendant was aware of Plaintiff's health conditions and Defendant had previously provided Plaintiff with time off work due to his disabilities proves that Defendant viewed him as disabled. The factual record of this case demonstrate that Plaintiff was otherwise qualified to perform the requirements of his position. Plaintiff was a skilled employee who had worked for the plant for 31 years and received satisfactory marks on his evaluations. Finally, Plaintiff suffered an adverse employment action is clearly satisfied because Defendant employer made an adverse employment decision as evidenced by Plaintiff's discipline and termination.

20

Therefore, Plaintiff suffered such action under **circumstances which give rise to an inference of unlawful discrimination.** The circumstances giving rise to the inference in this case include that Plaintiff adequately cleaned his work area to the best of his ability, voiced his concerns that the work area was impossible to completely be free of dust as the equipment was either lacking or inadequate and the fact that Wurst stated that an employee should not have been fired under such circumstances. (Wurst Depo. p. 54)

**b. Indirect evidence of age discrimination.**

Plaintiff was within the protected class because he was over 40 years old. Plaintiff was performing his job to the employer's legitimate expectations as evidenced by his satisfactory evaluations. (Doc 24-6 p. 222) Plaintiff suffered adverse employment actions by being subjected to meritless write-ups and subsequent termination. (Doc 24-6 p. 228)(Doc 24-6 p. 214) Finally, Defendant employer treated other younger employees more favorably as no other employees were terminated for violation of clean-up procedures. (EEOC Intake Questionnaire, page 2) in addition to other evidence that indicates that it is more likely than not that his age was the reason for the adverse employment action, such as fact that Plaintiff was being called "old school" by management. (Wurst Depo. p. 48). See, *Robin v. Espo Engineering Corp.,* 200 F.3d 1081 (7th Cir. 2000).


**c. Indirect evidence of FMLA discrimination.**

In the case at bar, (1) Plaintiff is protected under the FMLA because he had worked at Hoeganaes for over twelve months. He had actually worked for 31 years. (White Depo. p. 8) He suffered an adverse employment decision as evidenced by his termination. (Def. SOF ¶ 66 ) Finally, the adverse employment decision was made because of his previous requests

21

to leave under the FMLA. Plaintiff had used FMLA leave before and due and was concerned that it was "piling up on him." (White Depo p. 83) Additionally, due to his health condition, the possibility existed that would have to use it again. (White Depo. p. 83) After he expressed such concerns to Birdwell and asked for information on the ADA act, he was disciplined and terminated. (Def. SOF ¶ 66)

In analyzing whether the facts presented by Plaintiff above support a *prima facie* case for each of his discrimination causes of action, the court should consider that the "burden of establishing a *prima facie* case of disparate treatment is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Generally, at the summary judgment stage, a plaintiff's burden is merely to present evidence from which a reasonable jury could conclude that the plaintiff suffered an adverse employment action "under circumstances which give rise to an inference of unlawful discrimination." *Id.* Thus, a plaintiff normally must that he or she: 1) is a member of a protected class; 2) was qualified for the position; 3) suffered an adverse employment action; and 4) suffered such action under ***circumstances which give rise to an inference of unlawful discrimination.*** *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Monette,* 90 F.3d at 1177-86.

For these foregoing reasons, Plaintiff's discrimination causes of action should not be dismissed as a matter of law for failure to state a *prima facie* case.

### E. Defendant's alleged legitimate non-discriminatory reason for terminating Plaintiff was a mere pretext for discrimination.

The analysis for pretext is the same for ADEA, ADA and FMLA causes of action that are supported by indirect evidence. Once the employee successfully makes out a *prima facie* case, a

mandatory presumption of discrimination is created and the burden shifts to the employer to proffer a non-discriminatory reason for discharging the employee. *Monette* at 1185. If the employer is able to sustain its burden, then the mandatory presumption evaporates into a permissive inference, and the burden shifts back to the employee to show by a preponderance of the evidence that the employer's proffered reason for discharge was actually a pretext intended to hide unlawful discrimination. *Id.* at 1186. A showing of pretext can be made by demonstrating the proffered reason: (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action. *Imwalle v. Reliance Med. Prods., Inc*., 515 F.3d 531, 545 (6th Cir. 2008).

Pretext may be proven indirectly by showing that the employer's proffered explanation is unworthy of belief. *Smith v. Chrysler Corp.*, 155 F. 3d 799, 805-806 (6th Cir. 1998) In other words, the plaintiff can establish pretext if the employer's stated reason for action had no basis in fact, did not actually motivate the decision, or was never used in the past. *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 120 S.Ct. 2097 (2000).

In the case at bar, Defendant's proffered reason for discharge, that Plaintiff's failure to comply with housekeeping procedures, has no basis in fact. Plaintiff's station was clean and he was cleared for leaving work by the employee who came in after him. (Quebedeau Depo. p. 12). The equipment was inadequate or missing. Only one of Defendant's employees claimed that Plaintiff's workstation was unclean, his immediate supervisor, League, about whom Plaintiff had previously filed and EEOC claim. (White Depo. p 24) None of the Defendant's managers, Kuhle, Wilson or Wurst had personal knowledge that Plaintiff's workstation was unclean. Wurst relied on League's statements. (Wurst Depo. p. 25). Kuhle did not see the piles of powder that Plaintiff was alleged to not have cleaned up. (Kuhle Depo. p. 21). Wilson did not even participate in the

investigation. (Wilson Depo. p. 41) Plaintiff's previous complaints about safety were ignored. Management failed to report or consider Plaintiff's complaints of safety. (White Depo. p. 48) (White Depo. p. 63). The photographs of the piles of powder to not adequately portray an identifiable area. (Sherrell Depo. p. 25) Finally, Wurst testified that if an employee had not been able to adequately clean his area, he would not have been terminated.

## CONCLUSION

As such, there clearly exists a genuine issue of material fact negating Defendant's motion for summary judgment on all of Plaintiff's claims.

Respectfully submitted,

**ANDY L. ALLMAN & ASSOCIATES**

_/s/ R. Patrick Parker_ _____
Andy L. Allman, BPR No. 17857
R. Patrick Parker, BPR No. 16847
103 Bluegrass Commons Blvd.
Hendersonville, Tennessee  37075
Telephone:(615) 824-3761
Facsimile: (615) 264-2721

*Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing has been forwarded by electronic means via the Court's electronic filing system this 23rd day of August, 2013 to:

William S. Rutchow, TN Bar No. 017183
Jessica T. Patrick, TN Bar No. 028039
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
SunTrust Plaza, Suite 1200
401 Commerce Street
Nashville, TN 37219-2446

*Attorneys for Defendant Hoeganaes Corporation*

/s/ R. Patrick Parker
R. Patrick Parker, BPR No. 16847